

FILED & ENTERED

JUN 30 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY rust          DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>MAHMOOD JAFROODI,<br><br>               Debtor. | Case No. 9:19-bk-11918-MB<br><br>Chapter 7<br><br><br>**MEMORANDUM OF DECISION RE: MOTIONS TO COMPEL DEBTOR AND MICHAEL L. KAYLOR TO COMPLY WITH SUBPOENA [DKTS. 597, 599]** |

1        Chapter 7 trustee Jerry Namba (the "Trustee") seeks disclosure of communications between

2 Mahmood Jafroodi ("Debtor") and his attorney Michael L. Kaylor.[1]  Although Debtor waived any

3 attorney-client privilege he may hold, Debtor and Mr. Kaylor oppose production of the subject

4 communications on the basis that Azar Jafroodi, Debtor's wife, and 906 Eucalyptus Nursery, LLC

5 ("906 Eucalyptus"), an entity affiliated with Debtor, also were clients of Mr. Kaylor's.  As a result,

6 they contend that Mrs. Jafroodi and 906 Eucalyptus may assert the attorney-client privilege to

7 prevent disclosure of the subject documents.  The Trustee objects to Mr. Kaylor's classification of

8 Mrs. Jafroodi and 906 Eucalyptus as clients and argues, among other things, that the crime-fraud

9 exception applies to vitiate the attorney-client privilege.

10        As set forth below, the Court holds: (i) Mrs. Jafroodi was not Mr. Kaylor's client; (ii) 906

11 Eucalyptus was Mr. Kaylor's client; and (iii) pursuant to the crime-fraud exception, the Court will

12 conduct an *in camera* review of the subject communications.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

# I.

# BACKGROUND

## A.  The State Court Litigation and Retention of Mr. Kaylor

On February 3, 2011, Carolina Ramirez et al. (the "Ramirez Creditors") filed a class action lawsuit against Debtor and other defendants in California state court, initiating case no. CV110083 (the "State Court Action"). *See* Motion for Relief from the Automatic Stay [case dkt. 63], Declaration of Ezra Kautz, Exhibit 1.  In their amended complaint, the Ramirez Creditors asserted nine causes of action against the defendants, including claims for unpaid wages, failure to provide meal and rest breaks, failure to provide necessary protecting clothing and equipment, and violation of the Private Attorney General Act.  The state court set a trial date of December 18, 2019.

In December 2017, amidst the ongoing litigation, Debtor and 906 Eucalyptus retained Mr. Kaylor's law firm to provide "estate planning services." Declaration of Michael L. Kaylor [case dkt. 614], ¶ 2.  On December 15, 2017, in furtherance of this retention, Debtor completed a client intake form (the "Intake Form"). Declaration of Laila Masud [case dkt. 597], ¶ 8, Exhibit 2.

In Part B of the Intake Form, which asked Debtor to provide an asset summary, Debtor reported $126,000 in checking accounts and $450,000 in other tangible personal property.  Debtor also reported that the amount of cash he has "varies."  The Intake Form prompted Debtor to fill out the "ownership type" of each asset.  As to the cash, checking accounts, and tangible personal property assets, Debtor left blank the space under "ownership type."

In response to a prompt to identify his "business interests," Debtor referred to an attached flow chart of entities (the "Flow Chart").  The Flow Chart illustrated the ownership and management of six entities in which Debtor held an interest.  As relevant to this matter, Debtor indicated in the Flow Chart that one of these entities, Jafroodi Properties, LP ("JPLP"), owned real property located at 887 Mesa Road, Nipomo, CA 93444 (the "Nipomo Property").  In addition to these assets, Debtor also reported $5.5 million in residential real property, $2,702,356 in retirement plans, and $11,815,000 in "other property," which Debtor noted referred to the Nipomo Property, as assets.  As to these assets, Debtor filled in the space under "ownership type" with "1980 Jafroodi Family Trust," "P.S. and 401K," and "JPLP," respectively.

1  In Part C, which asked Debtor to fill out any retirement, disability, or death benefits, Debtor

2  listed a 401K, which he valued at $178,986, and the Plant Growers Management, Inc. Profit Sharing

3  Plan (the "PGM PSP"), which he valued at $2,523,370.  Debtor noted that he was the beneficiary of

4  both plans.

5  On February 22, 2018, Mr. Kaylor signed a retainer agreement between his law firm and 906

6  Eucalyptus (the "Retainer"). *Id.*, ¶ 7, Exhibit 1.  In the Retainer, Mr. Kaylor agreed to provide the

7  following legal services: (A) "Creation and Implementation of a Private Retirement Plan;" and (B)

8  "Yearly Analysis and Actuarially Services."  The last page of the Retainer includes a space for the

9  client to provide a signature; below that space, the Retainer refers to the client as: "Client(s)

10  Mahmood Jafroodi, for 906 Eucalyptus Nursery, LLC."  Debtor did not sign the Retainer, either on

11  behalf of himself or 906 Eucalyptus.  The Retainer is signed only by Mr. Kaylor.

12  **B.  Creation of the Private Retirement Plan and Transfers Into the Plan**

13  Effective April 6, 2018, Mr. Kaylor and Debtor, whether on behalf of himself or 906

14  Eucalyptus, executed The Private Retirement Trust Plan for The Jafroodi Private Retirement Trust

15  Created by 906 Eucalyptus Nursery, LLC (the "PRP"). *Id.*, ¶ 45, Exhibit 16.  Debtor signed the PRP

16  as "Representative for 906 Eucalyptus Nursery, LLC." *Id.*, p. 45.  The PRP designated 906

17  Eucalyptus as the settlor of the PRP, Debtor and Mrs. Jafroodi as beneficiaries of the PRP, and Mr.

18  Kaylor as the trustee of the PRP. *Id.*, p. 2.  As relevant to this matter, the Certification of Trust,

19  attached to the PRP, provides:

20  The [PRP] Trustee shall also have the power to operate any such activities that occur

21  within the business entities owned by the Trust or to delegate those duties to a

22  manager or officer who will run the operations of the business entity for the benefit of

23  the Trust.  Notwithstanding the above, at no time may the [PRP] Trustee appoint the

24  [PRP] Beneficiary as manager of a limited liability company or any similar type of

25  position in a business entity that has the power and authority to bind the entity to act.

26  *Id.*, Certification of Trust, Section IX(e).

27  On May 23, 2018, Debtor signed several assignments transferring all of the entities listed in

28  the Intake Form into the PRP, including 906 Eucalyptus and JPLP. *Id.*, ¶ 45, Exhibit 16.  Debtor also

Case 9:19-bk-11918-MB    Doc 656    Filed 06/30/23    Entered 06/30/23 07:56:24    Desc
Main Document    Page 5 of 32

executed, on behalf of the 1980 Jafroodi Family Trust (the "Family Trust"), a deed of trust valued at $4,700,000 in favor of the PRP (the "PRP DOT"). *Id.* The PRP DOT encumbered the real property located at 1186 Corte Tularosa, Camarillo, CA 93010 (the "Camarillo Property"), in which Debtor claimed a fee simple interest as of the petition date.

### C. Communications Regarding the PRP

On April 17, 2018, Darlene Tardiff, Debtor's executive assistant, emailed Debtor's bankruptcy attorney, William Winfield, stating—

> Michael Kaylor has confirmed that the [PRP] for [Debtor] has been set up.
>
> It was our understanding that once the [PRP] was established that [Debtor's]
> retirement assets would be protected. With his assets protected you mentioned on the
> conference call that this would add a bargaining chip to the Plaintiff's [sic] in the suit
> against him and that you would write a letter to his attorney stating his assets are
> protected.
>
> [Debtor] would like to know when you feel the time is right to write such a letter.

Declaration of Laila Masud [case dkt. 546], ¶ 13, Exhibit 2. On May 1, 2018, Mr. Winfield wrote Ms. Tardiff—

> I have created a draft letter… but I would prefer not to send it until after the [PRP]
> has been finalized and funded and ideally a little time passes.

On June 11, 2018, Ms. Tardiff emailed Mr. Winfield to follow up on Mr. Winfield's progress on the letter. On June 12, 2018, Mr. Winfield responded—

> I can have a draft letter to you to review tomorrow or Thursday. I would like it best if
> the ink on the transfers to the [PRP] Trust was dry before we touted it - however in
> this case the [PRP] is just an additional layer of protection. The structure that has
> previously been set up is excellent and is the primary protection. That has been in
> place long enough that it cannot be challenged as a fraudulent transfer.

On June 13, 2018, Mr. Winfield again emailed Ms. Tardiff—

> Here is a draft of my letter…. Please pay special attention to the following to confirm
> my factual understanding is correct:

5

1) I state the [PRP] owns bank accounts and personal effects. I do not know how significant the bank accounts and personal effects are. Since the [PRP] was only recently funded, the transfers into the [PRP] could potentially be reached as a fraudulent transfer.

2) I state that the real estate is encumbered by $10,000,000. I do not know the current balance of outstanding loans or the current value of the real estate. However, the real estate should be protected in any event.

Overall, [Debtor] is in a very strong position to withstand his judgment. The only assets that are potentially reachable are the assets recently put into the [PRP]. They will remain potentially vulnerable for four years. However, it would require a lawsuit to determine the transfer was motivated by intent to hinder creditors as opposed to estate planning purposes. That lawsuit would be time consuming and expensive and would not be a slam dunk. Furthermore, [Debtor] could file a bankruptcy and make it even more difficult to reach the assets of the [PRP]. Please let me know if you have any questions or would like to discuss this.

### D. Transfers To and From Debtor's IRA

According to Ms. Tardiff, who served as the trustee of the PGM PSP, on July 30, 2018, after termination of the PGM PSP, Debtor rolled over $95,575.98 from the PGM PSP to a self-directed individual retirement account at Sunwest Trust, Inc. (the "IRA"). Declaration of Darlene Tardiff [case dkt. 485], ¶ 5.  In addition, according to Debtor, approximately $2.1 million was transferred from the PGM PSP to the IRA. Declaration of Mahmood Jafroodi [case dkt. 555], ¶ 8.

According to Ms. Tardiff, from July 26, 2018 through August 24, 2018, Ms. Tardiff and Omead Jafroodi, Debtor's son who also served as the trustee of the Jafroodi 2009 Irrevocable Trust (the "Irrevocable Trust"), executed multiple notes and promises to pay to effectuate the transfer of funds from the IRA to Ms. Tardiff and, finally, to the Irrevocable Trust.[2] *Id*., ¶¶ 6-9.  According to Ms. Tardiff, Debtor told Ms. Tardiff that he needed her assistance because the IRA could not enter into transactions with family members. *Id*., ¶ 11.

---

[2] The Irrevocable Trust was one of the entities Debtor transferred to the PRP.

For his part, Debtor stated that he transferred funds from the PGM PSP to the IRA "[o]n Mr. Kaylor's advice." Declaration of Mahmood Jafroodi [case dkt. 555], ¶ 8.  According to Debtor, after the Irrevocable Trust received the funds from the IRA, the Irrevocable Trust loaned JPLP $3.5 million to acquire the lien secured by the Nipomo Property. *Id*., ¶ 10.  Regarding these additional transfers, Debtor again asserted that "[t]hese transactions were structured based upon the advice of attorney [Mr.] Kaylor." *Id*.

### E. Debtor's Bankruptcy Filing

On October 16, 2019, Mr. Winfield emailed Debtor's state court counsel regarding Debtor's anticipated bankruptcy filing:

> My plan is to have everything ready to file when [Debtor] returns in about two weeks. It would be much better if the [bankruptcy] filing could be delayed in order to age his [PRP]. I am surprised that no settlement talks were engendered after plaintiff considered the specifics of the letter I provided. Bankruptcy threats are always easily suggested, but the specific results if presented to the other side are something that should have at least generated some kind of offer. I am not to[o] concerned with the plaintiff having a judgment. I am concerned about filing the bankruptcy too early.

Declaration of Laila Masud [case dkt. 579], ¶ 12, Exhibit 1.  After Debtor's state court counsel inquired how long it would take to age the PRP, Mr. Winfield responded, "[t]o be 100% bullet proof," he "would like to wait four years after the [PRP] was created…." *Id*.  In response, Debtor's state court counsel lamented that, "[u]nfortunately, there is no way [he could] put off the trial" for that long…." *Id*.

On November 19, 2019, approximately one month before trial was set to begin in the State Court Action, Debtor filed a voluntary chapter 7 petition.

In his schedule A/B, Debtor identified an interest in the Camarillo Property. Case Dkt. 1. Debtor valued the Camarillo Property at $3.3 million.  In his schedule C, Debtor claimed an exemption in the Camarillo Property for 100% of the fair market value, up to any applicable statutory limit.  In his schedule D, Debtor stated the Camarillo Property was encumbered by a first priority mortgage in the amount of $3,035,831 and the PRP DOT in the amount of $4.7 million.

In his schedule A/B, Debtor also identified an "equitable or future" interest in the PRP. Debtor scheduled the value of the PRP as "$0.00." In addition, Debtor scheduled an "equitable or future" interest in the following trusts: the Irrevocable Trust, the Family Trust , and the Jafroodi Management Trust. Debtor valued all of these trusts at "$0.00."

Debtor also identified an interest in the IRA, valued at $2,135,816. In his schedule C, Debtor claimed an exemption in the full amount of the IRA. Finally, Debtor scheduled an interest in certain vehicles, valuing these interests at $15,497. Debtor claimed an exemption in $10,200 of the vehicles. As a result, the total amount of nonexempt, unencumbered assets reflected in Debtor's schedules amounted to $5,297.

In his schedule E/F, Debtor identified an unsecured claim in favor of the Ramirez Creditors, which Debtor scheduled as disputed. Debtor valued the claim at $79,361,611.68.

### F.  Discovery and Turnover Disputes Between Debtor and the Trustee

On March 11, 2020, the Trustee filed a motion to conduct a Rule 2004 examination of Debtor (the "2004 Motion"). Case Dkt. 42. In the 2004 Motion, the Trustee noted that he hoped to investigate Debtor's assets, including the retirement accounts and trusts, as well as Debtor's claimed exemptions in such assets. On March 16, 2020, the Court entered an order granting the 2004 Motion (the "2004 Order"). Case Dkt. 47.

According to the Trustee, Debtor did not produce all of the documents responsive to the Trustee's request for production of documents. Declaration of Laila Masud [case dkt. 597], ¶ 15. Specifically, Debtor did not produce documents and communications related to the PRP, such as written correspondence with Mr. Kaylor, and Debtor did not provide a privilege log related to such communications.

As a result, on September 10, 2020, the Trustee filed a motion for issuance of an Order to Show Cause why Debtor should not be held in civil contempt for failure to comply with the 2004 Order and an unrelated turnover order, asserting that Debtor had not met his requirements under both orders. Case Dkt. 114. On September 26, 2020, the Court entered an Order to Show Cause why Debtor should not be held in contempt (the "OSC"). Case Dkt. 126. On October 21, 2020, the Court held a hearing on the OSC. Subsequently, on November 6, 2020, the Court entered an order

1  adjudicating Debtor to be in civil contempt (the "Contempt Order"). Case Dkt. 183.  Through the

2  Contempt Order, the Court required Debtor to purge his contempt of the 2004 Order within 14 days

3  of entry of the Contempt Order.

4      On November 18, 2020, Debtor's counsel emailed the Trustee's counsel, stating that Debtor

5  was asserting the attorney-client privilege with respect to the communications between Debtor and

6  Mr. Kaylor. Declaration of Laila Masud [case dkt. 597], ¶ 42, Exhibit 13.

7      On November 23, 2020, the Trustee's counsel received a privilege log prepared by Mr.

8  Kaylor (the "Privilege Log"). *Id*., ¶ 23, Exhibit 3.  The Privilege Log identified 84 emails, dated

9  between December 15, 2017 and March 23, 2020, as well as the Intake Form, the Retainer, and an

10 analysis letter prepared by Mr. Kaylor.  In connection with each listed email, Mr. Kaylor provided a

11 description of the subject of the correspondence.  Mr. Kaylor indicated that some of the

12 communications were about the "Jafroodi PR[P]," while other communications were about

13 "Jafroodi."  Moreover, Mr. Kaylor indicated that all of the communications identified in the

14 Privilege Log were between Mr. Kaylor and Debtor.  Mrs. Jafroodi was not listed as either an author

15 or recipient of any of the emails.

16     On February 10, 2021, while working to prepare a declaration by Mr. Kaylor regarding his

17 representation of Debtor, Debtor's counsel emailed Mr. Kaylor:

18     Thanks, but before I send the declaration, please clarify address [sic] the issue of who

19     exactly is your client. At paragraph 4, you state that [Debtor] is your client, but the

20     retainer agreement states that 906 Eucalyptus Nursery, LLC is the "client", and it is

21     also the settlor of the [PRP]. This is a little confusing.

22 Declaration of Laila Masud [case dkt. 597], ¶ 42, Exhibit 13.  On the same day, Mr. Kaylor

23 responded, "[Debtor] is my client, 906 is the plan sponsor."  In response, Debtor's counsel further

24 inquired:

25     But then why is 906 described in your retainer as "client". Is it an issue of the retainer

26     agreement is submitted to Trustee?

27 To this, Mr. Kaylor responded, "I believe they both are my clients…."  Debtor was copied on all of

28 these emails.

1    On February 11, 2021, Mr. Kaylor signed a declaration regarding his representation of

2    Debtor. *Id*., ¶ 43, Exhibit 14.  As relevant to this matter, Mr. Kaylor stated:

3    In approximately December, 2017 [Debtor] and 906 Eucalyptus[] retained KLF to

4    provide [Debtor] with estate planning services. The retainer agreement states that

5    [906 Eucalyptus] is the client, because it is the plan sponsor and settlor of the [PRP].

6    [Debtor] is the Plan Participant.  I treated both [Debtor] and 906 Eucalyptus as clients

7    and had privileged and confidential communications with [Debtor] with regard to the

8    [PRP].

9    …

10    The [PRP] designates me as the Trustee thereof. The email exchanges referenced in

11    the Privilege Log relate solely to my work as attorney for [Debtor], as set forth above,

12    and not in my capacity as Trustee.

13    *Id*., ¶¶ 4, 14.  Mr. Kaylor's declaration was devoid of any mention of Mrs. Jafroodi.

14    **G.  Transfer of the Nipomo Property**

15    On January 20, 2022, the Trustee filed a motion to approve the sale of litigation claims held

16    by the estate (the "Sale Motion"). Case Dkt. 308.  Through the Sale Motion, the Trustee sought the

17    Court's approval of a compromise with Debtor.  In relevant part, the parties agreed that Debtor

18    would pay $1 million to the estate in exchange for a discharge of the Contempt Order and the

19    Trustee's representation that he would not object to Debtor's claims of exemption.  The hearing on

20    the Sale Motion was continued several times.

21    Ultimately, the compromise was never finalized.  Instead, on November 10, 2022, the

22    Trustee filed another motion for issuance of an Order to Show Cause. Case Dkt. 382.  In that motion,

23    the Trustee asserted that, on December 14, 2021, while the parties were negotiating the terms of their

24    agreement, Debtor executed a grant deed transferring the Nipomo Property from JPLP to a third

25    party.  The Trustee argued that: (A) the estate has an interest in the Nipomo Property; (B) Debtor

26    absconded with the sale proceeds; and (C) Debtor refused to execute the finalized sale agreement

27    between the parties.  In connection with this filing, the Trustee provided a copy of the grant deed,

28

1   which showed that Debtor signed the grant deed on behalf of JPLP, 906 Eucalyptus, and the Family

2   Trust. Declaration of Jerry Namba [case dkt. 382], ¶ 31, Ex. 7.

3       **H.  Debtor's Waiver of His Attorney-Client Privilege and the Trustee's Additional**

4           **Requests for Production of Documents**

5       On November 17, 2022, the Trustee filed a brief, asserting that the estate holds the attorney-

6   client privilege between Debtor and Mr. Kaylor and purporting to waive that privilege. Case Dkt.

7   398.  On November 23, 2022, the Trustee filed a supplemental brief, asserting that the crime-fraud

8   exception requires production of the communications between Mr. Kaylor and Debtor. Case Dkt.

9   408.  Initially, Debtor filed a response to the Trustee's briefs, arguing that chapter 7 trustees may not

10  waive the attorney-client privilege held by individual debtors and repeatedly referring to the

11  privilege as *his* privilege. Case Dkt. 410.  At no point in this response did Debtor assert that the

12  privilege was held, either separately or jointly, by either 906 Eucalyptus or Mrs. Jafroodi.

13      On January 17, 2023, Debtor filed a declaration. Case Dkt. 494.  In this filing, Debtor

14  asserted that he would no longer assert his attorney-client privilege:

15          I have nothing to hide and I do not claim any attorney-client privilege. These records

16          will show that I always followed what I believed was legally appropriate advice.

17          …

18          For over three years now, I have openly shared all facts in my possession with my

19          attorneys and asked them to share those facts with the court and it's lawful

20          representatives. I acted in good faith. This is the TRUTH.

21  Again, the declaration did not contain any mention of either 906 Eucalyptus or Mrs. Jafroodi as joint

22  holders of the attorney-client privilege.

23      On January 24, 2023, Debtor filed a response to the Trustee's request for issuance of an

24  Order to Show Cause. Case Dkt. 498.  To this response, Debtor attached a declaration under penalty

25  of perjury.  Debtor again reiterated that he has "nothing to hide" and that he "do[es] not claim any

26  attorney-client privilege."  Once again, Debtor did not mention either 906 Eucalyptus or Mrs.

27  Jafroodi as joint holders of the privilege.

28

On January 26, 2023, the Court held a hearing on various matters in Debtor's case.  Debtor appeared.  During the hearing and on the record, Debtor again waived his attorney-client privilege.  On February 10, 2023, the Court entered a scheduling order (the "Scheduling Order"). Case Dkt. 519.  In relevant part, the Court held:

> Debtor has waived his attorney-client privilege with respect to all otherwise privileged documents and communications between Debtor and his former attorneys, including, but not limited to, Michael Kaylor, Esq. and William Winfield, Esq. Such documents and communications may now be provided to the Trustee;
>
> Due to Debtor's waiver of the attorney-client privilege, Debtor shall provide Trustee with all documents and communications between Debtor and his former attorneys no later than February 3, 2023. Trustee shall coordinate a messenger to pick up the physical documents located at Debtor's residence.

On the same day, after entry of the Scheduling Order, the Trustee's counsel sent an email to Mr. Kaylor. Declaration of Laila Masud [case dkt. 597], ¶ 29, Exhibit 5.  In the email, the Trustee's counsel notified Mr. Kaylor of the Scheduling Order and Debtor's waiver of the attorney-client privilege.  In light of this waiver, the Trustee's counsel asked Mr. Kaylor when he would turn over Debtor's client file.  Debtor was copied on this email.  As far as the Court can tell from the record, Mr. Kaylor did not respond to this email.

On February 15, 2023, Debtor filed another response, again attaching a declaration reasserting that he does not claim any attorney-client privilege. Case Dkt. 537.  On February 17, 2023, the Trustee's counsel sent a follow up email to Mr. Kaylor, asking Mr. Kaylor to "please advise when [the Trustee] can expect the client file, including communications." *Id*.  According to the Trustee's counsel, on February 27, 2023, Mr. Kaylor asked the Trustee's counsel to send a subpoena with the Trustee's document requests. *Id*., ¶ 32.  On the same day, the Trustee's counsel sent an email to Mr. Kaylor and attached a subpoena requesting production of Debtor's client file (the "Subpoena"). *Id*., ¶ 32, Exhibit 6.  The Trustee's counsel also asked Mr. Kaylor to confirm if he agreed to accept service of the Subpoena by email. *Id*.

On February 28, 2023, Debtor filed a declaration regarding the status of his production of documents. Case Dkt. 554. In relevant part, Debtor asserted that he turned over three boxes of documents to the Trustee, "which should have included emails with *my* prior counsel, William Winfield and *Michael Kaylor*." Declaration of Mahmood Jafroodi [case dkt. 554], ¶ 3a (emphases added). Debtor added:

> I spoke to the Trustee's counsel on February 14, 2023…. I told them that they could
> obtain my email correspondence with *my prior counsel* (*Michael Kaylor*, William
> Winfield and BG Law) from those attorneys because I believed that, if I did not still
> have those emails, *my prior counsel* should still have them. It is my understanding
> from paragraph 8 of the declaration of the Trustee's counsel (Laila Masud) that was
> filed on February 21, 2023 (docket no. 545) that she has sent written correspondence
> to *my former counsel (including Michael Kaylor* and William Winfield) requesting
> the production of my client file from them.

*Id*., ¶ 3c (emphases added).

On March 3, 2023, Mr. Kaylor replied to the Trustee's email attaching the Subpoena. Declaration of Laila Masud [case dkt. 597], ¶ 33, Exhibit 7. In his response, Mr. Kaylor asked Trustee's counsel for additional time to respond to the Subpoena. On the same day, Trustee's counsel sent an email to Mr. Kaylor informing Mr. Kaylor that a rolling production would be acceptable to the Trustee and repeating the Trustee's request for Mr. Kaylor to accept service of the Subpoena by email. *Id*.

On March 6, 2023, Trustee's counsel followed up with Mr. Kaylor, asking again if Mr. Kaylor would accept service of the Subpoena by email. *Id*., ¶ 34, Exhibit 8. On the same day, Mr. Kaylor replied to the email, accepting service of the Subpoena by email. *Id*.

### I. 906 Eucalyptus' and Mrs. Jafroodi's Claims of Privilege

On March 16, 2023, Mr. Kaylor, via counsel, responded to the Subpoena by asserting, for the first time, that Mrs. Jafroodi also is entitled to assert the attorney-client privilege and has not waived the privilege. Declaration of Laila Masud [case dkt. 597], ¶ 35, Exhibit 9. On March 28, 2023, the Trustee responded to Mr. Kaylor's counsel, noting that Mrs. Jafroodi was not named in the Retainer,

1 the Privilege Log did not identify any communications between Mrs. Jafroodi and Mr. Kaylor, and

2 Mr. Kaylor had never stated that Mrs. Jafroodi was his client. *Id*., ¶ 37, Exhibit 11.

3       On April 7, 2023, Mr. Kaylor's counsel responded to the Trustee's counsel, stating that Mr.

4 Kaylor believed Mrs. Jafroodi was a client because she was a beneficiary of the PRP and that, if the

5 Trustee wanted to compel production of Debtor's client file over the asserted privilege by Mrs.

6 Jafroodi, the Trustee should file a motion to compel. *Id*., ¶ 40, Exhibit 12. On April 13, 2023,

7 Debtor filed another supplemental declaration explaining the status of his document production.

8 Case Dkt. 591. This time, Debtor stated, for the first time in any of his declarations, that Mrs.

9 Jafroodi may have an attorney-client relationship with Mr. Kaylor:

10       While my wife did not hire Mr. Kaylor in connection with our retirement planning in

11       2018 by him, Mr. Kaylor was acting on her behalf in connection with that planning,

12       so I understand his concern that he was rendering services to her too. Given that

13       concern, I do not believe it would be appropriate at this point for me to violate any

14       attorney-client privilege that my wife had with Mr. Kaylor by obtaining my emails

15       communications with him and producing them for the Trustee. At this point, my

16       attorney is addressing this issue with the Trustee's counsel and Mr. Kaylor.

17 Declaration of Mahmood Jafroodi [case dkt. 591], ¶ 9. In connection with this filing, Debtor also

18 submitted a declaration by Mr. Kaylor. Case Dkt. 591. In Mr. Kaylor's declaration, Mr. Kaylor

19 stated, in relevant part:

20       In approximately December 2017, [Debtor] and 906 Eucalyptus[] retained KLF to

21       provide [Debtor] with estate planning services. A formal written retainer agreement

22       was executed in approximately February 2018. The retainer agreement identified 906

23       Eucalyptus[] as the client because it is the plan sponsor and settlor of the [PRP].

24       [Debtor] was a plan participant in the PTRP. His wife (Azar Jafroodi) also was a plan

25       participant in the [PRP]. As I previously have stated in a declaration that I provided

26       counsel for [the Trustee], I treated both [Debtor] and 906 Eucalyptus as clients and

27       had privileged and confidential communications with [Debtor] with regard to the

28       [PRP]. I also treated Mrs. Jafroodi as a client because (like [Debtor]) she was a plan

1   participant in and a beneficiary of the [PRP]. She was not required to have been

2   employed by 906 Eucalyptus to be a plan participant in and a beneficiary of the

3   [PRP].

4   …

5   However, it also is my understanding that 906 Eucalyptus and Azar Jafroodi have not

6   waived the attorney-client privilege regarding communications that I had with

7   [Debtor], Ms. Tardiff or any other person who also was acting on behalf of 906

8   Eucalyptus or Mrs. Jafroodi in communicating with me. Accordingly, I believe that I

9   am required to assert the attorney-client privilege on behalf of 906 Eucalyptus and

10  Mrs. Jafroodi….

11  Declaration of Michael L. Kaylor [case dkt. 591], ¶¶ 2, 4.

12      On May 1, 2023, the Trustee filed a motion for an order compelling Mr. Kaylor to turn over

13  Debtor's client file (the "Kaylor Motion"). Case Dkt. 597.  On the same day, the Trustee also filed a

14  motion for an order compelling Debtor to turn over his client file with Mr. Kaylor (the "Debtor

15  Motion"). Case Dkt. 599.  Through these motions, the Trustee asserts: (A) Mr. Kaylor did not meet

16  his burden of establishing an attorney-client relationship between himself and Mrs. Jafroodi; (B)

17  even if Mr. Kaylor can establish an attorney-client relationship between himself and Mrs. Jafroodi,

18  the subject communications are subject to the crime-fraud exception; (C) Mr. Kaylor should be

19  compelled to compensate the Trustee for attorneys' fees and costs incurred by the estate; (D) the

20  Court should compel Mr. Kaylor to turn over Debtor's client file under 11 U.S.C. § 542(e); and (E)

21  because Debtor has expressly waived his attorney-client privilege, the Court should compel Debtor

22  to direct Mr. Kaylor to turn over his client file to the estate.

23      On May 8, 2023, Mr. Kaylor and Debtor filed oppositions to the Kaylor Motion and Debtor

24  Motion, respectively (the "Oppositions"). Case Dkts. 614, 618.  In the Oppositions, Mr. Kaylor and

25  Debtor argue: (A) 906 Eucalyptus is Mr. Kaylor's client and has not waived its privilege; (B) Mrs.

26  Jafroodi is Mr. Kaylor's client on account of being a beneficiary of the PRP; (C) the

27  communications between Debtor and Mr. Kaylor are not property of the estate subject to turnover

28

under 11 U.S.C. § 542; and (D) the Trustee has not made a *prima facie* case for the crime-fraud exception.

On May 15, 2023, the Trustee filed replies to the Oppositions. Case Dkts. 619, 620.  Aside from reiterating the arguments in the Kaylor Motion and the Debtor Motion, the Trustee asserts that Mr. Kaylor belatedly raised the attorney-client privilege held by 906 Eucalyptus.

On May 22, 2023, the Court held a hearing on the Kaylor Motion and the Debtor Motion. Appearances were made as noted on the record.  During the hearing, Mr. Kaylor and Debtor requested an opportunity to provide additional briefing.  The Court approved their request and set a schedule for the parties to submit supplemental briefing to the Court.

On May 31, 2023, Mr. Kaylor and Debtor filed their supplemental brief, asserting that: (A) Mr. Kaylor cannot waive the attorney-client privilege on behalf of 906 Eucalyptus or Mrs. Jafroodi; (B) the Privilege Log, which was submitted to the Trustee in November 2020, qualified as a valid and timely objection to the Subpoena; and (C) the crime-fraud exception does not apply to joint clients such as 906 Eucalyptus and Mrs. Jafroodi. Case Dkt. 642.  To this supplemental brief, Mr. Kaylor and Debtor attached, for the first time, a declaration by Mrs. Jafroodi (the "Mrs. Jafroodi Declaration"). *Id*.  In the belated Mrs. Jafroodi Declaration, Mrs. Jafroodi states:

> Although I did not sign a written retainer agreement with Mr. Kaylor and although I did not communicate directly with Mr. Kaylor, I understood that my husband was communicating with Mr. Kaylor on behalf of both of us and that Mr. Kaylor was providing retirement planning legal services to 906 Eucalyptus, my husband and me. Thus, I considered Mr. Kaylor to be an attorney who was representing me, as well as 906 Eucalyptus and my husband. I am informed that Mr. Kaylor had the same understanding.

Mrs. Jafroodi Declaration, ¶ 2.  Mr. Kaylor and Debtor also submitted another declaration by Debtor in support of the supplemental brief (the "Supplemental Debtor Declaration"). Case Dkt. 642.  In the belated Supplemental Debtor Declaration, Debtor states—

> 906 Eucalyptus was a limited liability company that was an "active" entity in the State of California as of early 2018 when I hired Mr. Kaylor on its behalf.  At the

1    time, I was and I had been the manager of 906 Eucalyptus.  I am informed that 906

2    Eucalyptus is still an "active" entity in the State of California, and it is my

3    understanding that I am still its manager because I have never resigned from that

4    position.  It also was my most recent employer as of 2018.

5    Supplemental Debtor Declaration, ¶ 3.

6         On the same day, the Trustee filed a supplemental brief, reiterating his position that Mr.

7    Kaylor did not establish an attorney-client relationship between himself and either Mrs. Jafroodi or

8    906 Eucalyptus, that any objection by 906 Eucalyptus to the Subpoena was untimely, and that the

9    crime-fraud exception applies to pierce the attorney-client privilege in this case. Case Dkt. 643.

10        On June 7, 2023, the parties filed their replies to the supplemental briefs, reiterating their

11   arguments from previously filed pleadings. Case Dkts. 645, 646.  Mr. Kaylor and Debtor submitted

12   another declaration by Mr. Kaylor in support of their reply brief (the "Kaylor Reply Declaration").

13   Case Dkt. 645.  In the belated Kaylor Reply Declaration, Mr. Kaylor states:

14        906 Eucalyptus is a California limited liability company. Under California law, it is

15        my understanding that the assignment of the member's ownership interest in 906

16        Eucalyptus to the [PRP] did not operate as an assignment of all of the member's

17        rights, which would include the right to assert the attorney-client privilege on behalf

18        of 906 Eucalyptus. Instead, as trustee of the [PRP], I am entitled to any distributions

19        from 906 Eucalyptus, i.e., the beneficial financial interest in 906 Eucalyptus.

20   Kaylor Reply Declaration, ¶ 2.  Having reviewed the record before the Court, the Kaylor Motion, the

21   Debtor Motion, the oppositions and replies thereto, and the supplemental briefing authorized by the

22   Court, the Court holds as follows.[3]

23

24

25   _____

26   [3] In their briefs, the parties briefly discuss whether, as of the petition date, the Trustee inherited Debtor's attorney-client privilege. As discussed above, Debtor expressly waived his attorney-client privilege.  As such, this issue is moot.
However, the Court notes that there is in-circuit authority holding that chapter 7 trustees do not inherit the attorney-client
27   privilege where the chapter 7 debtor is an individual. *In re Ginzburg*, 517 B.R. 175, 181 (Bankr. C.D. Cal. 2014).  In addition, both parties request attorneys' fees and costs under FRCP 37.  However, a determination about attorneys' fees
28   and costs is premature.  The parties may request such fees and costs after the Court has issued a final decision on whether and to what extent the crime-fraud exception applies.

## II.

## LEGAL ANALYSIS

### A.  Timeliness of Objections

Pursuant to Federal Rule of Civil Procedure ("FRCP") 45(d)(2)(B), an objection to a subpoena "must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served."  In addition, under FRCP 45(e)(2)(A), "[a] person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must (i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim."

"Under Rule 45, the nonparty served with the subpoena duces tecum must make objections to it within 14 days after service or before the time for compliance, if less than 14 days.  Failure to serve timely objections waives all grounds for objection, including privilege." *U.S. ex rel. Schwartz v. TRW, Inc.*, 211 F.R.D. 388, 392 (C.D. Cal. 2002).

> Rule 45(c)(2)(B)[ ] require[s] the recipient of a subpoena to raise all objections at
> once, rather than in staggered batches, so that discovery does not become a "game."
> We ... believe that [Rule 45](d)(2) contains additional requirements for a claim of
> privilege, not alternative ones. While we are mindful that "the investment of time
> necessary to review all responsive documents for privileged material ... does not lend
> itself to the limited fourteen (14) day time period ...," a person responding to a
> subpoena should at least assert any privileges within the 14 days provided in Rule
> 45(c)(2)(B). A full privilege log may follow "within a reasonable time," or if more
> time is needed an extension may be sought from the trial court.

*In re DG Acquisition Corp.,* 151 F.3d 75, 81 (2d Cir. 1998) (citations omitted).

Here, the objections to the Subpoena were untimely.  As discussed above, the Trustee emailed the Subpoena to Mr. Kaylor on February 27, 2023.  Mr. Kaylor responded to the Subpoena, on behalf of Mrs. Jafroodi, on March 16, 2023, i.e., 3 days after the deadline.  As far as the Court can tell from the record, Mr. Kaylor did not object on behalf of 906 Eucalyptus until Debtor

1  submitted a declaration by Mr. Kaylor on April 13, 2023, i.e., well over a month after a response to

2  the Subpoena was due.

3       In addition, to date, Mr. Kaylor has not provided a privilege log in connection with either

4  Mrs. Jafroodi's or 906 Eucalyptus' claim of privilege.  As noted in *DG Acquisition*, a "full privilege

5  log" should follow an objection based on privilege "within reasonable time." *DG Acquisition*, 151

6  F.3d at 81.  In his briefing, Mr. Kaylor asserts that, because he submitted the Privilege Log in

7  November 2020, i.e., approximately two and a half years before service of the Subpoena, 906

8  Eucalyptus was not required to object to or submit another privilege log in response to this

9  Subpoena.  However, such a holding by the Court would contradict the language and spirit of Rule

10  45(e)(2), which requires parties to "expressly make the claim" of privilege and provide adequate

11  descriptions of withheld documents. FRCP 45(e)(2)(A)(i), (ii).  A privilege log that was submitted:

12  (i) years ago; (ii) in response to *a different subpoena*; and (iii) related to a claim of privilege asserted

13  by *a different client* does not qualify as the type of express claim or adequate description

14  contemplated by Rule 45.

15       In addition, by Mr. Kaylor's and Debtor's own prior admissions, Debtor consulted with Mr.

16  Kaylor about matters beyond the creation of the PRP.  For example, Debtor stated, under penalty of

17  perjury, that he followed Mr. Kaylor's legal advice regarding the transfers to and from the IRA.  As

18  far as the Court can tell from the record, the IRA was not affiliated with the PRP.  Mr. Kaylor has

19  not articulated why 906 Eucalyptus' retention of Mr. Kaylor for the purpose of creating the PRP has

20  any relationship to advice Debtor obtained regarding his IRA and, as a result, why 906 Eucalyptus

21  would have the right to claim communications about the IRA as privileged.

22       In fact, the Privilege Log itself appears to create a distinction between communications

23  regarding the PRP, which may have involved 906 Eucalyptus as the PRP's settlor, and

24  communications regarding Debtor.  Specifically, in the Privilege Log, Mr. Kaylor refers to

25  communications regarding the former as "Jafroodi PR[P]" and communications regarding the latter

26  as simply "Jafroodi."  Because it appears Mr. Kaylor may have provided Debtor personal advice

27  separate from advice related to creation of the PRP, Mr. Kaylor should have timely provided a

28  particularized privilege log on behalf of each client.

19

1    Mr. Kaylor also asserts that the Court cannot pierce 906 Eucalyptus' and Mrs. Jafroodi's

2  attorney-client privilege because of Mr. Kaylor's inadequate and untimely response to the Subpoena.

3  Mr. Kaylor argues that the Trustee should have served a subpoena on 906 Eucalyptus and Mrs.

4  Jafroodi directly.  As discussed more fully below, until the current dispute, neither Debtor nor Mr.

5  Kaylor had ever referred to Mrs. Jafroodi as Mr. Kaylor's client.  As such, the Trustee could not

6  have known to serve Mrs. Jafroodi with a subpoena.  In any event, the Trustee's failure to serve a

7  subpoena on Mrs. Jafroodi after Mr. Kaylor's assertion of the privilege on her behalf does not impact

8  the disposition of this matter.  For the reasons discussed below, Mrs. Jafroodi was not Mr. Kaylor's

9  client, and there was no reason for the Trustee to serve a subpoena on an individual who did not hold

10  the attorney-client privilege.

11    With respect to 906 Eucalyptus, Debtor himself states, in the belated Supplemental Debtor

12  Declaration, that at the time he hired Mr. Kaylor, he was the manager of 906 Eucalyptus and that "it

13  is [his] understanding that [he is] still its manager because [he has] never resigned from the

14  position."  Mr. Kaylor filed a belated declaration to the same effect.  Thus, as of February 10, 2023,

15  Debtor had actual notice of the Court's Scheduling Order requiring disclosure of the subject client

16  file.  Debtor did not object on behalf of 906 Eucalyptus.  Instead, Debtor continued to file

17  declarations reasserting his waiver of the attorney-client privilege.

18    Nevertheless, given the significance of vitiating the attorney-client privilege, the Court will

19  not dispose of this matter solely based on the inadequacy and untimeliness of the objections.

20    **B.  The Attorney-Client Privilege**

21    "Federal Rule of Evidence ("FRE") 1101 provides that the rule of evidentiary privilege of the

22  FRE applies to all stages of proceedings before bankruptcy judges." *In re Yassai*, 225 B.R. 478, 482

23  (Bankr. C.D. Cal. 1998).  "Where there are federal question claims and pendent state law claims

24  present, the federal law of privilege applies." *Agster v. Maricopa County*, 422 F.3d 836, 839 (9th

25  Cir. 2005); *see also In re Hotels Nevada, LLC*, 458 B.R. 560, 568-70 (Bankr. D. Nev. 2011) (holding

26  that the federal law on attorney-client privilege applies where trustee seeks documents under §

27  542(e)).

28

1    Although the trustee argues that California law should apply regarding the attorney-client

2    relationships at issue, the law referenced above dictates that federal law should apply.  In fact, the

3    procedural facts of *Hotels Nevada* are similar to the facts here. *Hotels Nevada*, 458 B.R. 560.  There,

4    the debtors filed for bankruptcy protection after an arbitration award assessed over $144 million in

5    damages against the debtors and its principal. *Id*., at 564.  The chapter 7 trustee requested turnover of

6    documents held by the debtors' former law firm, in part to assess potential avoidance actions with

7    respect to the debtors. *Id*., 564-65.  The law firm claimed the attorney-client privilege on behalf of

8    the debtors' principal; in other words, the law firm asserted the privilege on behalf of a client other

9    than the debtors. *Id*., at 564.

10    The trustee's request for turnover was made under 11 U.S.C. § 542, based on the allegation

11    that such files were property of the debtors' bankruptcy estates. *Id*., at 565.  Among other issues, the

12    law firm responded that 11 U.S.C. § 542(e) permitted it to decline turnover of items that are subject

13    to an applicable privilege. *Id*.  Under these facts, the bankruptcy court noted that:

14    The trustee thus seeks the documents under both Section 541(a) and Section 542(e),

15    presenting a mix of governing law; federal law as to the Section 542(e) issues, and

16    Nevada law as to the ability of [the principal] to block turnover of co-owned property

17    by invoking the attorney-client privilege. In such circumstances, federal law applies

18    to sort out the nondebtor's ability to stymie the return of debtor's property, or the

19    transfer of nondebtor property related to "the debtor's property or financial affairs" to

20    the trustee.

21    *Id*., at 568. After citing several cases holding that federal law on privileges applies in connection

22    with Rule 2004 examinations and subpoenas, the Court also noted that "Rule 501 requires reference

23    to state privilege law only when a discrete bankruptcy adversary proceeding involves solely a state

24    law claim." *Id*., at 570 n.7 (citing *In re Couch,* 80 B.R. 512, 514–16 (S.D. Cal. 1987) (applying

25    California privilege law to bankruptcy proceeding where Trustee had filed direct action for claims

26    under California Insurance Code); *and In re Tidewater Group, Inc.,* 65 B.R. 179, 181 (Bankr. N.D.

27    Ga. 1986) (applying state privilege law in adversary proceeding concerning solely state tort and

28

contract law issues)).  As such, the Court will apply federal common law on attorney-client privilege to this matter.

"[A] party asserting the attorney-client privilege has the burden of establishing the [existence of an attorney-client] relationship *and* the privileged nature of the communication." *United States v. Ruehle,* 583 F.3d 600, 607 (9th Cir.2009) (emphasis in *Ruehle*) (internal quotation omitted). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* (quoting *United States v. Martin,* 278 F.3d 988, 999 (9th Cir.2002)).  Courts use an eight-part test to determine whether information is covered by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*U.S. v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010) (internal citation omitted).[4]  "The party asserting the privilege bears the burden of proving each essential element." *Id*. (internal quotation omitted).

### i.  Mrs. Jafroodi

Mr. Kaylor has not met his burden of proving that Mrs. Jafroodi was Mr. Kaylor's client. First, the record before the Court is completely devoid of any evidence that Mrs. Jafroodi sought legal advice of any kind from Mr. Kaylor.  In fact, there is no evidence that Mrs. Jafroodi has ever spoken to Mr. Kaylor at all.  The Privilege Log does not list any communications between Mrs. Jafroodi and Mr. Kaylor.  Moreover, the parties have not submitted any correspondence between Mr. Kaylor and Mrs. Jafroodi, nor was Mrs. Jafroodi copied on any of the emails involving Mr. Kaylor. In addition, Mrs. Jafroodi was not identified as a client in the Retainer.  Consequently, the Court cannot even apply a majority of the eight-part test in *Graf* because, quite simply, there are no communications between Mrs. Jafroodi and Mr. Kaylor to which the test would apply.

---

[4] In his original opposition, Mr. Kaylor argues that the *Graf* test does not apply to individual clients.  However, there is no language in *Graf* limiting the eight-part test to corporate clients. Moreover, Mr. Kaylor has not cited, and the Court has not found, any such authority. Mr. Kaylor's only citation on this point is *United States v. Lonich*, 2016 WL 1733633, at *5 (N.D. Cal. May 2, 2016), which does not, at any point, hold that the *Graf* test applies only to corporate clients.

1    Additional facts support a finding that Mrs. Jafroodi was not Mr. Kaylor's client.  Both

2    Debtor and Mr. Kaylor have been aware for approximately *three years* that the Trustee has been

3    requesting disclosure of Debtor's client file.  In those three years, Mr. Kaylor has repeatedly

4    represented that Debtor and/or 906 Eucalyptus were his clients and, because of their entitlement to

5    the attorney-client privilege, Mr. Kaylor could not produce the file.  At no point did Mr. Kaylor

6    inform the Court or the Trustee that he was similarly barred from cooperating with the Trustee based

7    on any privilege held by Mrs. Jafroodi.  Notably, before Debtor waived his attorney-client privilege,

8    Debtor's counsel asked Mr. Kaylor to identify his clients. *See* Declaration of Laila Masud [case dkt.

9    597], ¶ 42, Exhibit 13.  Mr. Kaylor responded that he believed both 906 Eucalyptus and Debtor were

10    his clients.  Given that Mr. Kaylor was corresponding with *Debtor's counsel*, Mr. Kaylor would not

11    have any motivation to be less than forthcoming in this particular communication.

12    The first time Mr. Kaylor represented that Mrs. Jafroodi was his client was shortly after

13    Debtor waived his attorney-client privilege and the Court memorialized the waiver in the Scheduling

14    Order.  Notwithstanding the language in the Scheduling Order requiring disclosure of the

15    communications between Debtor and Mr. Kaylor, and despite the Trustee's several requests for

16    turnover of the file, Mr. Kaylor and Debtor did not produce the documents.  Instead, over one month

17    after the Court entered the Scheduling Order, Mr. Kaylor asserted, for the first time, that he could

18    not turn over the file because Mrs. Jafroodi also was his client.

19    Mr. Kaylor does not dispute this factual record.  Rather, Mr. Kaylor asserts that Mrs. Jafroodi

20    should be treated as his client because she is a beneficiary of the PRP.[5]  On this point, Mr. Kaylor

21    relies on case law related to the fiduciary exception to the attorney-client privilege. *See United States*

22    *v. Evans*, 796 F.2d 264 (9th Cir. 1986); *and United States v. Mett*, 178 F.3d 1058 (9th Cir. 1999).

23    Under this exception, "[t]here is no attorney-client privilege between a pension trustee and an

24    attorney who advises the trustee regarding the administration of the plan." *Evans*, 796 F.2d at 265–

25    66.

26

27

28    _____
[5] The Court did not provide leave for the parties to submit additional evidence.  Nevertheless, Mr. Kaylor belatedly
submitted a declaration by Mrs. Jafroodi in which Mrs. Jafroodi parrots this argument.

1    This exception had its genesis in English trust law, but has since been applied to

2    numerous fiduciary relationships. *See generally* Charles F. Gibbs & Cindy D.

3    Hanson, *The Fiduciary Exception to a Trustee's Attorney/Client Privilege,* 21 ACTEC

4    NOTES 236 (1995). As applied in the ERISA context, the fiduciary exception

5    provides that "an employer acting in the capacity of ERISA fiduciary is disabled from

6    asserting the attorney-client privilege against plan beneficiaries on matters of plan

7    administration." *Becher v. Long Is. Lighting Co. (In re Long Is. Lighting Co.),* 129

8    F.3d 268, 272 (2d Cir.1997).

9    *Mett*, 178 F.3d at 1063.  As explained by the Ninth Circuit of Appeals, cases applying the fiduciary

10   exception "mark out two ends of a spectrum." *Id.*, at 1064.

11   On the one hand, where an ERISA trustee seeks an attorney's advice on a matter of

12   plan administration and where the advice clearly does not implicate the trustee in any

13   personal capacity, the trustee cannot invoke the attorney-client privilege against the

14   plan beneficiaries. On the other hand, where a plan fiduciary retains counsel in order

15   to defend herself against the plan beneficiaries (or the government acting in their

16   stead), the attorney-client privilege remains intact.

17   *Id.*  As is evident from these authorities, the fiduciary exception applies when there is a dispute

18   *between the plan trustee and the plan beneficiaries*.  The exception simply provides that trustees owe

19   a fiduciary duty to plan beneficiaries and may not hide behind the attorney-client privilege when

20   beneficiaries sue the trustee for malfeasance and request discovery in furtherance of such a lawsuit.

21   Mr. Kaylor has not cited any cases in which the fiduciary exception applied in any other

22   context, such as disputes between plan beneficiaries and third parties.  Nor has Mr. Kaylor cited any

23   authorities holding that the fiduciary exception creates an attorney-client relationship between a plan

24   beneficiary and an attorney where such a relationship does not otherwise meet the applicable test set

25   forth in *Graf*.[6]  As such, the fiduciary exception is inapplicable in the case at hand.

26

27

28   [6] Under California law, trust beneficiaries are not deemed clients even when they sue a trustee for misconduct related to the trust. *Wells Fargo Bank v. Superior Ct.*, 22 Cal.4th 201, 213 (Ct. App. 2000).

1    Mr. Kaylor also notes that 906 Eucalyptus is designated as the client in the Retainer, and that

2    Debtor, like Mrs. Jafroodi, is identified only as a beneficiary of the PRP.  Thus, Mr. Kaylor argues

3    that it would be inconsistent for the Court to treat Debtor as Mr. Kaylor's client, but not Mrs.

4    Jafroodi.  However, the Court is not relying on Debtor's status as a plan beneficiary to find that

5    Debtor and Mr. Kaylor had an attorney-client relationship.  As highlighted in the facts above, since

6    the inception of this case, both Mr. Kaylor and Debtor have been consistent in describing Debtor as

7    Mr. Kaylor's client. *See, e.g.* Declaration of Laila Masud [case dkt. 597], ¶ 42, Exhibit 13 (email

8    from Mr. Kaylor informing Debtor's counsel that both Debtor and 906 Eucalyptus were his clients);

9    *and* Declaration of Mahmood Jafroodi [case dkt. 554], ¶ 3a (repeatedly describing Mr. Kaylor as *his*

10   attorney).  In addition, the record reflects several communications between Debtor and Mr. Kaylor,

11   whether directly, as reflected by the Privilege Log, or indirectly, through Debtor's other's attorneys

12   or Ms. Tardiff.  None of these facts apply to Mrs. Jafroodi.

13   Moreover, it appears Debtor sought and obtained advice from Mr. Kaylor for himself, and

14   not just on behalf of 906 Eucalyptus.  As discussed above, Debtor repeatedly stated that he relied on

15   Mr. Kaylor's advice to structure the transfers from the PGM PSP into the IRA and, eventually, to

16   fund a buyout of the lien against the Nipomo Property.  Debtor and Mr. Kaylor have not articulated

17   how these transfers had anything to do with 906 Eucalyptus' retention of Mr. Kaylor to create the

18   PRP.  Thus, the record reflects instances in which Debtor obtained advice from Mr. Kaylor for his

19   own benefit, and not merely in his capacity as a member of 906 Eucalyptus.  There are no such

20   communications between Mr. Kaylor and Mrs. Jafroodi.

21   The prepetition emails between Debtor's attorneys also reflect that *Debtor's* attorneys, such

22   as Mr. Winfield and Debtor's state court counsel, were driving the decisions related to the timing of

23   transfers to the PRP, the State Court Action (in which Debtor was a defendant but Mrs. Jafroodi was

24   not), and the timing of Debtor's bankruptcy petition (in which petition Mrs. Jafroodi did not join).

25   As such, the Court's treatment of Debtor as a client is not inconsistent with a finding that Mrs.

26   Jafroodi was not a client.

27

28

1   For the reasons set forth above, Mr. Kaylor has not met his burden of proving that there was

2   ever an attorney-client relationship between Mr. Kaylor and Mrs. Jafroodi.[7]

3         **ii.  906 Eucalyptus**

4   On the other hand, Mr. Kaylor *has* met his burden of proving that 906 Eucalyptus was his

5   client.  As explained above, the Retainer identifies 906 Eucalyptus as a client that sought Mr.

6   Kaylor's legal advice for the purpose of creating the PRP.  906 Eucalyptus also is named as settlor

7   and creator of the PRP.  Moreover, in the Privilege Log, Mr. Kaylor indicated that several of the

8   communications relate to the PRP, i.e., the reason 906 Eucalyptus hired Mr. Kaylor as a lawyer.

9   There is nothing on the record showing that such communications were not made in confidence.

10  Thus, Mr. Kaylor's relationship with 906 Eucalyptus meets the eight-part test set forth in *Graf*.

11  Nevertheless, as discussed below, 906 Eucalyptus must produce the subject documents for *in camera*

12  review in respect of the crime-fraud exception.

13        **C.  The Crime-Fraud Exception to the Attorney-Client Privilege**

14  "Under the crime-fraud exception, communications are not privileged when the client

15  'consults an attorney for advice that will serve him in the commission of a fraud' or crime." *In re*

16  *Grand Jury Investigation*, 810 F.3d 1110, 1113-14 (9th Cir. 2016).  "To invoke the crime-fraud

17  exception, a party must satisfy a two-part test." *Id*. (internal quotation omitted).

18  First, the party must show that the client was engaged in or planning a criminal or

19  fraudulent scheme when it sought the advice of counsel to further the scheme.

20  Second, it must demonstrate that the attorney-client communications for which

21

22

---

23  [7] Although the Court must apply federal common law in this matter, the Court notes that the result would be the same
    under California law.  Under California law, "[t]he party claiming the privilege has the burden of establishing the

24  preliminary facts necessary to support its exercise, i.e., a communication made in the course of an attorney-client
    relationship." *Wood v. Superior Ct. of San Diego Cnty.*, 46 Cal.App.5th 562, 580 (Ct. App. 2020).  "As used in this

25  article, 'confidential communication between client and lawyer' means information transmitted between a client and his
    or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware,

26  discloses the information to no third persons other than those who are present to further the interest of the client in the
    consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the

27  accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice
    given by the lawyer in the course of that relationship." Cal. Evid. Code § 952.  For the same reasons stated herein, Mr.

28  Kaylor has not met his burden of proving that any such "confidential communication[s] between client and lawyer"
    existed between Mr. Kaylor and Mrs. Jafroodi.

1    production is sought are sufficiently related to and were made *in furtherance of* the

2    intended, or present, continuing illegality.

3    *Id.* (internal quotation omitted) (emphasis in *Grand Jury*).

4              **i.    *In Camera* Review**

5         Before the Court can assess whether the crime-fraud exception requires disclosure of

6    documents to the Trustee, the Court must decide whether *in camera* review of the subject documents

7    is appropriate.  As explained by the Supreme Court of the United States:

8         In fashioning a standard for determining when *in camera* review is appropriate, we

9         begin with the observation that *in camera* inspection is a smaller intrusion upon the

10        confidentiality of the attorney-client relationship than is public disclosure.  We

11        therefore conclude that a lesser evidentiary showing is needed to trigger *in camera*

12        review than is required ultimately to overcome the privilege. *Ibid.* The threshold we

13        set, in other words, need not be a stringent one.

14        We think that the following standard strikes the correct balance. Before engaging in

15        *in camera* review to determine the applicability of the crime-fraud exception, the

16        judge should require a showing of a factual basis adequate to support a good faith

17        belief by a reasonable person that *in camera* review of the materials may reveal

18        evidence to establish the claim that the crime-fraud exception applies.

19   *United States v. Zolin*, 491 U.S. 554, 572, 109 S.Ct. 2619, 2630–31, 105 L.Ed. 2d 469 (1989)

20   (internal quotations and citations omitted).  The Ninth Circuit Court of Appeals elaborated on the

21   type of showing that meets the *Zolin* test:

22        The government must make only a minimal showing that the crime-fraud exception

23        could apply. Some speculation is required under the *Zolin* threshold. The threshold is

24        not a stringent one because *in camera* review of documents is a much smaller

25        intrusion on the attorney-client privilege than full disclosure. The first step is meant

26        only to prevent groundless fishing expeditions.

27

28

1    *United States v. Christensen*, 828 F.3d 763, 800–01 (9th Cir. 2015) (internal quotations omitted).

2    "Once that showing is made, the decision whether to engage in *in camera* review rests in the sound

3    discretion of the district court." *Zolin*, 491 U.S. at 572, 109 S.Ct. at 2631, 105 L.Ed.2d 469.

4        Here, the Trustee has set forth a factual basis adequate to support a good faith belief by a

5    reasonable person that *in camera* review of the materials may reveal evidence to establish the claim

6    that the crime-fraud exception applies.  Specifically, the following facts are sufficient as a "minimal

7    showing" that 906 Eucalyptus and Debtor may have sought advice from Mr. Kaylor in an attempt to

8    fraudulently conceal assets from creditors, and that the Trustee is not merely engaging in a

9    groundless fishing expedition.[8]

10        At the time Debtor and 906 Eucalyptus retained Mr. Kaylor, Debtor was mired in a years-

11    long class action lawsuit brought by the Ramirez Creditors.  Based on the Ramirez Creditors' proof

12    of claim, the Ramirez Creditors assert damages in excess of $50 million.  The communications that

13    are already in the record between Debtor, his attorneys, and/or his assistant show that Debtor and

14    906 Eucalyptus sought Mr. Kaylor's advice with a potentially fraudulent scheme to shield assets

15    from creditors.  In her email to Mr. Winfield on Debtor's behalf, Ms. Tardiff indicated that Debtor

16    hired Mr. Kaylor to set up the PRP as "a bargaining chip to the [Ramirez Creditors'] suit against"

17    Debtor.  Mr. Winfield also repeatedly expressed concerns about the timing of the creation of the PRP

18    vis-à-vis Debtor's bankruptcy filing because "the transfers into the [PRP] could potentially be

19    reached as a fraudulent transfer."

20        Moreover, all of Mr. Winfield's commentary regarding the PRP involved Debtor's ability to

21    withstand judgment, especially in the face of fraudulent transfer litigation.  The emails are silent

22    regarding any other purpose or use for the PRP.  For example, the emails do not contain any

23    calculations regarding the amount Debtor would need for retirement purposes.  Instead, the emails

24    reflect an effort to shield *all* of Debtor's assets from creditors.

25        These efforts appear to have come to fruition before Debtor filed his bankruptcy case.

26    Despite having reported over $20 million in assets to Mr. Kaylor via the Intake Form, by the time

27

28    [8] At this time, the Court is only assessing whether the Trustee has shown that a reasonable person may believe, in good
faith, that the crime-fraud exception applies.  The Court is not making conclusive findings of fact or holding that Debtor
and 906 Eucalyptus actually committed fraud when they obtained legal advice from Mr. Kaylor.

Debtor filed his chapter 7 petition, Debtor scheduled a total of only $5,297 in nonexempt, unencumbered assets. Debtor scheduled two significant assets: the Camarillo Property and the IRA. However, Debtor indicated that the Camarillo Property was completely encumbered, in part because of the PRP DOT executed by Debtor in connection with the transfer of assets into the PRP. As to the IRA, Debtor claimed the entire account exempt. Any other assets that may have been owned by Debtor, or otherwise brought into the estate by the Trustee's operation of entities owned or managed by Debtor, had been transferred into the PRP. Although Debtor scheduled the PRP and certain trusts, Debtor indicated that these assets provided a value of $0.00 to his bankruptcy estate.[9]

Finally, notwithstanding the elaborate effort to create the PRP and place Mr. Kaylor in control, it appears Debtor has been exercising control over properties and entities transferred to the PRP. Postpetition, and long after the transfer of JPLP into the PRP, Debtor executed a grant deed transferring the Nipomo Property from JPLP to a third party. The grant deed was signed by Debtor on behalf of JPLP, 906 Eucalyptus, and the Family Trust. Despite Mr. Kaylor's status as the trustee of the PRP, Mr. Kaylor's signature was absent from the grant deed. In addition, based on Debtor's subsequent accounting of the sale proceeds, it appears Debtor spent and further transferred the proceeds of the sale of the Nipomo Property. Further, notwithstanding the language in the PRP that prohibits a beneficiary of the PRP from acting as a manager of any limited liability company owned by the PRP, Debtor continues to hold himself out as the manager of 906 Eucalyptus.

These facts are more than adequate to support a "minimal showing" that Debtor and 906 Eucalyptus were engaged in a fraudulent scheme when they sought Mr. Kaylor's advice to further that scheme. As a result, the Trustee has established adequate grounds to trigger *in camera* review of the subject documents under *Zolin*.

---

[9] Debtor and Mr. Kaylor contend that these transfers could not have been fraudulent because Debtor's assets already were protected by the trusts and entities that owned the assets. However, the record before the Court contradicts this statement. In the Intake Form, which Debtor completed when he sought to retain Mr. Kaylor, Debtor made sure to specify which of his affiliated entities owned each asset. As to $576,000 in checking accounts and personal property, Debtor did not specify any ownership type, which suggests that Debtor may have owned those assets himself. This notion is further bolstered by Mr. Winfield's email to Ms. Tardiff, dated June 13, 2018, in which Mr. Winfield explained that Debtor's "bank accounts and personal effects" were especially vulnerable to fraudulent transfer litigation, presumably because these assets were transferred directly from Debtor into the PRP.

1    Debtor and Mr. Kaylor assert that the Court should not apply the crime-fraud exception

2 against 906 Eucalyptus (or Mrs. Jafroodi).[10]  However, by Debtor's own admission, at all relevant

3 times, Debtor was the manager of 906 Eucalyptus.  As such, given Debtor's continuous control of

4 906 Eucalyptus, the notion that 906 Eucalyptus acted separate and apart from Debtor elevates form

5 over substance.  In addition, the *prima facie* narrative set forth by the Trustee equally implicates 906

6 Eucalyptus.  The nature of the fraudulent scheme described above, i.e., that the very creation of the

7 PRP was fraudulent, would necessarily involve 906 Eucalyptus.  As such, if the Trustee has made a

8 *prima facie* showing that Debtor was "engaged in or planning" a fraudulent scheme when he sought

9 Mr. Kaylor's help in creating the PRP, which the Trustee has, then it logically follows that the

10 Trustee also has made a *prima facie* showing that 906 Eucalyptus was involved in the same scheme.

11    The case cited by Debtor and Mr. Kaylor is inapposite.  In *In re Richard Roe, Inc.*, 68 F.3d

12 38 (2d Cir. 1995), the Second Circuit Court of Appeals remanded a matter because the district court

13 applied the incorrect standard *after* conducting *in camera* review of documents. *Richard Roe*, 68

14 F.3d at 40.  Instead of assessing whether the communications were "in furtherance of" the alleged

15 illegality in that case, the district court considered whether the communications qualified as relevant

16 evidence. *Id.*  As concerns joint privilege holders, the Second Circuit Court of Appeals instructed:

17    The district court shall determine which, if any, of the documents or communications

18    were in furtherance of a crime or fraud, as discussed above. If production is ordered,

19    the court shall specify the factual basis for the crime or fraud that the documents or

20    communications are deemed to have furthered, which of the parties asserting claims

21    of privilege possessed a criminal or fraudulent purpose with respect to those

22    documents or communications, and, if appropriate, whether the crime-fraud exception

23    applies to an innocent joint privilege-holder.

24 *Id.*, at 41.  As such, *Richard Roe* stood for the proposition that a district court conducting *in camera*

25 review should assess each privilege holder's criminal or fraudulent purpose to determine if the

26 crime-fraud exception applies to all clients. *Id.*  This holding further supports the Court's use of *in*

27

28 [10]  The Court need not decide whether the crime-fraud exception applies to Mrs. Jafroodi because Mrs. Jafroodi was not Mr. Kaylor's client.  Nevertheless, even if Mrs. Jafroodi was Mr. Kaylor's client, the analysis herein also would apply to her.

1  *camera* review to determine which documents *and which clients* are subject to the crime-fraud

2  exception.

3      Taken together, the facts set forth above demonstrate a reasonable good faith basis that *in*

4  *camera* review of Debtor's and 906 Eucalyptus' client file may reveal evidence to establish that the

5  crime-fraud exception applies.

6                  **ii.    The Next Step**

7      Once a *prima facie* case is made as to the first element of the crime-fraud exception, "a

8  district court must examine the individual documents themselves to determine that the specific

9  attorney-client communications for which production is sought are sufficiently related to and were

10  made in furtherance of the intended, or present, continuing illegality." *Grand Jury*, 810 F.3d at 1114

11  (internal quotation omitted).  "In a civil case, the burden of proof for the party seeking disclosure

12  under the crime-fraud exception is preponderance of the evidence, meaning more likely than not."

13  *Eastman v. Thompson*, 594 F.Supp.3d 1156, 1195–96 (C.D. Cal. 2022).[11]

14      "[T]he crime-fraud exception does not require a *completed* crime or fraud but only that the

15  client have consulted the attorney in an *effort* to complete one." *Id*., at 1196 (emphasis in *Eastman*)

16  (internal quotation omitted).  "The exception applies even if the attorney does not participate in the

17  criminal activity, and even if the communication turns out not to help (and perhaps even to hinder)

18  the client's completion of a crime." *Id*. (internal quotation omitted).

19      Upon assessing Debtor's and 906 Eucalyptus' client file *in camera*, the Court will make an

20  individualized determination regarding whether each communication is more likely than not to show

21  that the communication: (A) is subject to the attorney-client privilege at all; (B) is sufficiently

22  related to and made in furtherance of the intended fraud; and (C) implicates each client entitled to

23  claim the attorney-client privilege.

24      In light of the above, Mr. Kaylor and Debtor must deliver Debtor's client file, including the

25  subject communications between Debtor and Mr. Kaylor, to the Court no later than **July 7, 2023**.

26  _____

27  [11] The preponderance of the evidence standard is used in civil cases when a court is deciding whether to terminate the privilege and require disclosure to the opposing party; the much more lenient *Zolin* standard is used to determine if *in camera* review is appropriate, as discussed above. *See In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1096 (9th Cir.

28  2007), *abrogated  on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009) (explaining the different standards applicable to *in camera* review and outright disclosure of documents).

1    All documents must be in .pdf form.  In addition, each .pdf file must comprise a separate document

2    and be given a unique document name.  Debtor, Mr. Kaylor, and/or their counsel may contact

3    chambers to arrange delivery of the documents by the deadline set forth herein.

**III.**

**CONCLUSION**

Based on the foregoing, the Court will enter a separate order requiring Debtor and Mr.

Kaylor to submit the subject communications for *in camera* review by the Court.  After such review,

the Court will issue a final order regarding which communications, if any, must be disclosed to the

Trustee in accordance with the crime-fraud exception to the attorney-client privilege.

# # #

Date: June 30, 2023

Martin R Barash
United States Bankruptcy Judge